**FOX VALLEY & VICINITY CONSTRUCTION WORKERS PENSION FUND, Plaintiff–Appellee,**

v.

**Laurine BROWN (Lamar), Defendant–Appellant,**

**and**

**Dessie Brown, Defendant–Appellee,**

**and**

**All Unknown Claimants, Defendants.**

No. 88–2322.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 18, 1989.

Reargued En Banc Dec. 6, 1989.

Decided March 9, 1990.

Bernard M. Baum, James M. Neuman, Baum & Sigman, Chicago, Ill., Roy Hasseltine, Harris & Hasseltine, Florence, Ala.,

Nicholas F. Esposito, Mark A. Schramm, Terence M. Heuel, Esposito & Heuel, Chicago, Ill., for plaintiff-appellee Fox Valley.

Gerald L. Morel, Masuda, Funai, Eifert & Mitchell, Chicago, Ill., Daniel N. Janich, Lyons, Ill., for defendant-appellant Laurine Brown.

Roy Hasseltine, Harris & Hasseltine, Florence, Ala., for defendant-appellee Dessie Brown.

Before BAUER, Chief Judge, CUMMINGS, WOOD, Jr., CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION, KANNE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

This is an interpleader action filed by the Fox Valley & Vicinity Construction Workers Pension Fund ("Fund") to determine the proper recipient of a death benefit payable because of the death of Fund participant James Brown ("James"). The defendants in the action are Laurine Brown ("Laurine"), James's former spouse, and Dessie Brown ("Dessie"), James's mother. The district court denied Laurine's motion for summary judgment and entered summary judgment against Laurine and in favor of Dessie, ordering the Fund to pay the death benefit to Dessie. Laurine appeals this decision.

The Fund brought this interpleader action under 28 U.S.C. § 1335. The district court had jurisdiction pursuant to 29 U.S.C. § 1132(e). This case raises issues under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## I. FACTUAL BACKGROUND

Laurine and James were married on April 14, 1982. James was covered by the Fox Valley & Vicinity Construction Workers Pension Plan ("Plan"), which provided for a Lump Sum Death Benefit ("Death Benefit") payable to the plan participant's designated beneficiary if the participant died before reaching retirement age. The Plan specifies how a participant may designate a beneficiary:

The Participant's Beneficiary shall be the person or persons he so designates in the last written notice received in the Administrative Office prior to the Participant's death. It shall be the responsibility of the Participant to notify in writing the Administrative Office of his choice of Beneficiary or any change in Beneficiary. A Participant may, without the consent of his then designated Beneficiary, or Beneficiaries, change his Beneficiaries. In the event that the [P]articipant shall fail to name a Beneficiary, or if such Beneficiary shall not be living at the time of the Participant's death, such benefits shall be paid to:

(a) his legal spouse, if living;

(b) if no spouse be living, then to his living children in equal shares;

(c) if no spouse or children be living, then to his parents in equal shares, or the survivor of such parents if only one (1) be living;

(d) if no spouse, children, or parents be living, then to his living brothers and sisters in equal shares;

(e) if no spouse, children, parents, or brothers and sisters be living, then to the estate of such deceased Participant.

In 1986, James executed a Beneficiary Designation Form naming Laurine as his beneficiary. On September 29, 1986, Laurine and James were divorced. They both agreed to a court-approved property settlement that included the following proviso:

The parties each waive any interest or claim in and to any retirement, pension, profit-sharing and/or annuity plans resulting from the employment of the other party.

Even after their divorce, James continued to live with Laurine for much of 1986 and 1987. James made no effort to change his designated beneficiary after the divorce. James died on June 17, 1987.

This dispute arose when Laurine attempted to have the Death Benefit paid to

her. The Fund refused, claiming that it was uncertain who should receive the Death Benefit. The Fund then filed this interpleader action, asserting that although Laurine was the designated beneficiary, it was uncertain as to the legal effect of the marital property settlement agreement in which Laurine seemingly waived her right to any benefits from the Fund. The Fund also named Dessie as a defendant since, under the Plan, Dessie would receive the benefit if the court determined that Laurine properly waived her claim.

Laurine moved for summary judgment on October 21, 1987, arguing that James, who was unrepresented at their divorce hearing, never read or understood the terms of the marital property settlement, which had been prepared by her lawyer. Laurine also asserted that even after the divorce, James intended for her to receive benefits from the Fund. The district court denied Laurine's motion for summary judgment. The court then entered summary judgment against Laurine and in favor of Dessie, finding that Laurine had waived her right to the Death Benefit. In this appeal, Laurine finds fault with the district court's use of the marital property settlement agreement. Laurine claims the court erred when it allowed the marital property settlement to affect Laurine's right under the Plan.

## II. DISCUSSION

■ Summary judgment should be granted only when there are no genuine issues of material fact and when the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 50(c). There were no disputed facts in this case and the district court found that, as a matter of law, the death benefit should be paid to Dessie.[1] We review that decision de novo. *EEOC v.*

*Sears, Roebuck & Co.*, 839 F.2d 302, 354 (7th Cir.1988).

■ As the district court noted, this is a case of first impression under ERISA. We must determine whether a divorced spouse who was designated as a beneficiary prior to the divorce will still receive the Death Benefit despite a provision in the divorce settlement waiving any rights to the benefit. Because ERISA preempts state pension benefit laws, 29 U.S.C. § 1144(a), we must find the answer to this issue within ERISA itself or in the federal common law interpreting ERISA. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45, 107 S.Ct. 1549, 1551–52, 95 L.Ed.2d 39 (1987) (state law relating to employee benefit plans preempted); *Mutual Life Ins. Co. of New York v. Yampol*, 840 F.2d 421, 425 (7th Cir.1988) (uniform remedies are fundamental to ERISA). In this case, our attention is focused on ERISA's anti-alienation provisions. 29 U.S.C. § 1056(d)(1), (d)(3)(A).

ERISA provides that a pension plan must prohibit the alienation or assignment of benefits. 29 U.S.C. § 1056(d)(1). These "spendthrift" provisions are designed to prevent unwise alienation or assignment. *AT & T v. Merry*, 592 F.2d 118, 124 (2d Cir.1979). ERISA was amended in 1984 to clarify the effect of these spendthrift provisions on family support obligations such as alimony, child support, and separate maintenance. Retirement Equity Act of 1984, Pub.L. No. 98–397, 98 Stat. 1426 (1984); *see* S.Rep. No. 575, 98th Cong., 2d Sess. 18–19, *reprinted in* 1984 U.S. Code Cong. & Admin.News 2547, 2564–65. Prior to the enactment of these amendments, some courts tentatively exempted state domestic relations orders from the ERISA anti-alienation provisions. *See, e.g., Operating Engineers' Local #428 Pension Trust Fund v. Zamborsky*, 650 F.2d 196, 200 (9th Cir. 1981) (order assigning benefits for alimony

---

1. It was suggested that there were unresolved material facts that prevented summary judgment. These unresolved facts concerned the consideration for the agreement and the background leading up to its signing. On its face the agreement states that the parties each considered it to be in their best interests to settle between them all rights of every kind, nature,

and description which either of them had or might hereafter have or claim against the other. It was stated that the consideration was the mutual and several promises and understandings set forth in the agreement regarding property interests, and for other good and valuable considerations. We see no need to try to go behind the mutual agreement of the parties.

not in conflict with ERISA); *AT & T v. Merry,* 592 F.2d at 124–25 (ERISA provisions do not alter traditional support obligations); *Cody v. Reicker,* 594 F.2d 314, 317 (2d Cir.1979) (ERISA does not prevent garnishment for support obligations).

The 1984 amendments removed most uncertainties by creating a limited exception to the anti-alienation provisions for a state domestic relations order if it is a "qualified domestic relations order" ("QDRO"). 29 U.S.C. § 1056(d)(3)(A). A domestic relations order must meet certain technical requirements to be recognized as a QDRO under ERISA. 29 U.S.C. § 1056(d)(3)(B)–(E). All parties to this case agree that the property settlement does not meet the requirements of a QDRO.

Laurine argues that since the settlement is not a QDRO, the anti-alienation provisions nullify the property settlement. She claims that the settlement can have no effect on the designation of beneficiary. ERISA prohibits the assignment or alienation of benefits, and, according to Laurine, ERISA makes an exception only for a QDRO. Laurine claims that if a marital property settlement does not qualify, ERISA benefits must be paid pursuant to the original designation of beneficiary.

Laurine is correct when she states that ERISA preempts any attempt to alienate or assign benefits by a domestic relations order if that order is not a QDRO. The marital property settlement at issue in this case, however, was not an assignment or alienation of benefits by James. In the settlement, James made no attempt to dispose of his interest. Instead, Laurine disclaimed any right she had to the benefits. Laurine, a nonparticipant in the Plan, waived her right to any benefit, just as James waived any right to benefits from Laurine's pension. This marital property settlement was incorporated into the divorce decree entered by the Circuit Court of Kane County, Illinois on September 29, 1986. That court found that the decree, presented for its consideration, "was entered into freely and voluntarily between the parties" and was "not unconscionable." Therefore that court specifically made the

settlement agreement a part of the divorce decree expressly ratifying, confirming, approving, and adopting it as an order of the court. It was specifically a part of the judgment of the court that "each of the parties shall perform under the terms of said agreement."

In arguing that her waiver is preempted by ERISA, Laurine misinterprets the purpose behind the spendthrift provisions and the intended effect of a QDRO. The spendthrift provisions of ERISA are designed to "ensure that the employee's accrued benefits are actually available for retirement purposes," by preventing unwise assignment or alienation. H.R.REP. No. 807, 93d Cong., 2d Sess. 1974, *reprinted in* 1974 U.S.CODE CONG. & ADMIN.NEWS 4639, 4670, 4734. These provisions focus on the assignment or alienation of benefits by a participant, not the waiver of a right to payment of benefits made by a designated beneficiary. The QDRO exception is also centered on the alienation or assignment of benefits. As noted in the legislative history, "the creation, recognition, or assignment of the alternate payee's right to the benefits" will only be exempted from the spendthrift provisions if the QDRO requirements are met. S.REP. No. 575, 98th Cong., 2d Sess. 19, *reprinted in* 1984 U.S. CODE CONG. & ADMIN.NEWS 2547, 2565. A QDRO creates a right to payment of benefits. The marital property settlement at issue in this case waives any right to those benefits.

The QDRO requirements specify the procedures necessary to assign benefits, but those procedures need not be followed when a nonparticipant is waiving an interest in pension benefits. ERISA allows beneficiaries to waive their interests in benefits. *See, e.g.,* 29 U.S.C. § 1055(c)(1)(A)(i) (spouse may waive interest in joint and survivor form of benefit at any time). The 1984 ERISA amendments made clear that a QDRO was the proper method of preserving the interests of a former spouse in pension benefits. *See* S.REP. No. 575, 98th Cong., 2d Sess. 19, *reprinted in* 1984 U.S. CODE CONG. & ADMIN.NEWS 2547, 2565. As the district court noted, if the Browns had wished to secure Laurine's interest in the

benefits, they could have executed a QDRO establishing such a right. Other methods were also available to establish Laurine's interest. Laurine and James could have left any mention of pension benefits out of the marital property settlement, or James could have redesignated Laurine as his beneficiary. Instead, the Browns jointly agreed to waive all interest in each other's pension plans. Such a waiver does not fall within the scope of ERISA's spendthrift provisions. We hold that a proper waiver of interest by a nonparticipant in a plan is not preempted by ERISA's anti-alienation provisions, which in this case was incorporated by a state court into a judgment.

Laurine erroneously asserts that *Lyman Lumber Co. v. Hill,* 877 F.2d 692 (8th Cir.1989), conflicts with this court's holding that ERISA's anti-alienation provisions do not preempt an explicit waiver of interest by a nonparticipant in a plan.[2] *Lyman* is distinguishable from the factual situation in *Fox Valley.* In *Lyman,* a participant in an employer profit-sharing plan named his wife as his primary beneficiary and his parents and a brother as contingent beneficiaries. The participant divorced his wife approximately five years after naming her as primary beneficiary under the plan. The divorce decree stated that Jeffery Hill, the plan participant, "shall have as his own, free of any interest of [his ex-wife], his interest in the profit-sharing plan of his employer...." Jeffery Hill died on December 15, 1984, without having changed his plan beneficiary designation after the divorce. While the beneficiary designation provision of the Lyman plan is not quoted in the Eighth Circuit's opinion, the court noted that "[u]nder the Plan, each participant may name the beneficiaries who will receive the remainder of his vested account balances upon his death." *Id.* at 693. The Eighth Circuit cited *Fox Valley & Vicinity*

*Construction Workers v. Brown,* 684 F.Supp. 185, 188 (N.D.Ill.1988), when it noted that the general rule is that a divorce does not affect a beneficiary designation in a life insurance policy. Significantly, the Eighth Circuit also cited the district court opinion in *Fox Valley* when it observed that "[t]he spouse's beneficiary interest can be divested, however, pursuant to a property settlement in a divorce judgment." *Lyman,* 877 F.2d at 693. The *Lyman* court found that the general wording of the divorce decree did not specifically refer to and modify the beneficiary interest of the participant's ex-wife. The Eighth Circuit therefore affirmed the district court's award of benefits to the primary beneficiary.[3] The *Lyman* opinion is not in conflict with this court's holding and arguably supports the result we have reached. Unlike the factual setting in *Lyman,* Laurine and James in the present case signed a voluntary property settlement agreement that included an explicit mutual waiver of any rights each might have had in the other's pension plan.

Having established that it is possible for a nonparticipant to waive an interest in pension benefits without using a QDRO, we must now determine whether there was an effective waiver of interest in this case. ERISA is silent on the issue of what constitutes a proper waiver in this situation, and the existing body of federal common law interpreting ERISA gives little guidance on this point. After finding that ERISA's anti-alienation provisions did not prohibit a waiver of pension benefits under these circumstances, the district court turned to state law and found that under Illinois law, and in most jurisdictions, a divorce decree would not affect the pension rights of a person who has been designated as a beneficiary unless the property settlement specifically included a termi-

---

2. In support of her position, Laurine also cites IRS Private Letter Ruling No. 8905058. A private letter ruling, however, may not be used or cited as precedent. *See* 26 U.S.C. § 6110(j)(3); *see also Liberty Nat'l Bank & Trust v. United States,* 867 F.2d 302, 305 (6th Cir.1989); *David R. Webb Co. v. Commissioner,* 708 F.2d 1254, 1257 n. 1 (7th Cir.1983). Thus, we will not consider that portion of Laurine's brief which

relies exclusively on the IRS private letter ruling as authority.

3. The district court's holding was based on its finding that the primary beneficiary's waiver of benefits was not knowing and voluntary and was therefore without effect. *Lyman,* 877 F.2d at 693.

nation of those rights. *See O'Toole v. Central Laborers' Pension and Welfare Funds*, 12 Ill.App.3d 995, 997, 299 N.E.2d 392, 394 (1973). The district court held that the waiver in the marital property settlement was a specific termination of benefits.

■■ When ERISA is silent on an issue, a federal court must fashion federal common law rules to govern ERISA suits. *Nachwalter v. Christie*, 805 F.2d 956, 959 (11th Cir.1986) (courts must develop federal rules when interpreting ERISA); *Amato v. Bernard*, 618 F.2d 559, 567 (9th Cir.1980) (Congress intended that courts would develop federal common law for ERISA). In making such rules, we must of course look to the statute itself for guidance, *In re White Farm Equip. Co.*, 788 F.2d 1186, 1191 (6th Cir.1986), and it is also proper to turn to state law when creating such rules, *Scott v. Gulf Oil Corp.*, 754 F.2d 1499, 1502 (9th Cir.1985), as long as such state law is consistent with the policies underlying the federal statute at issue, *Nachwalter*, 805 F.2d at 960. The district court properly examined a closely analogous area of state law—a former spouse's right to recover life insurance benefits. In Illinois, a decree of divorce only affects the rights of a divorced spouse if a property settlement agreement specifically includes a provision terminating the beneficiary's interest. *O'Toole*, 12 Ill.App.3d at 997, 299 N.E.2d at 394 (citations omitted). Many states follow this rule when interpreting divorce settlement provisions. *See, e.g., Prudential Ins. Co. v. Cooper*, 666 F.Supp. 190, 192 (D.Idaho 1987) (applying Idaho law), *aff'd*, 859 F.2d 154 (9th Cir.1988); *Lincoln Nat'l Life Ins. Co. v. Blight*, 399 F.Supp. 513, 515 (E.D.Pa.1975) (applying Pennsylvania law), *aff'd*, 538 F.2d 319 (3d Cir.1976); *Lynch v. Bogenrief*, 237 N.W.2d

793, 798 (Iowa 1976); *Keeton v. Cherry*, 728 S.W.2d 694, 697 (Mo.Ct.App.1987); *Bell v. Garcia*, 639 S.W.2d 185, 191 (Mo.Ct.App. 1982); *Haley v. Schleis*, 97 N.M. 561, 562, 642 P.2d 164, 165 (1982); *Culbertson v. Continental Assurance Co.*, 631 P.2d 906, 913-14 (Utah 1981). The district court was correct in finding that the waiver contained in the marital property settlement specifically dealt with the pension fund benefits, including the Death Benefit at issue in this case.

Laurine counters by pointing to other language in *O'Toole* that seems to qualify the ability of a divorce settlement to affect the rights of a beneficiary. In *O'Toole*, the Illinois court did state that only a specific waiver of benefits would affect a beneficiary's rights "unless the policy itself or a statute provides otherwise." *O'Toole*, 12 Ill.App.3d at 997, 299 N.E.2d at 394. As the district court pointed out, this qualification does not refer to the general method of designating a beneficiary found in the policy. Instead, the *O'Toole* court was referring to provisions or statutes that would automatically terminate a spousal interest upon divorce. Laurine's argument that only the method of changing beneficiaries provided in the Plan should be given legal effect is unpersuasive.[4]

The ability of a spouse to waive rights to a benefit through a specific waiver in a divorce settlement has been recognized by many courts and we adopt that rule for purposes of ERISA. Laurine contends that such a rule will work against ERISA's need for uniformity and bring uncertainty into the administration of the plan. We are not convinced by these arguments. As we have noted, federal courts are charged with creating federal common law rules to govern ERISA, *Nachwalter*, 805 F.2d at 959, and the creation of such federal rules will

---

**4.** An Illinois appellate court has also interpreted *O'Toole v. Central Laborers' Pension and Welfare Funds*, 12 Ill.App.3d 995, 997, 299 N.E.2d 392 (1973), as supporting a finding of waiver when the primary beneficiary executed a waiver of her rights as part of a property settlement upon dissolution of her marriage. In *Principal Mutual Life Ins. Co. v. Juntunen*, 189 Ill.App.3d 224, 136 Ill.Dec. 700, 545 N.E.2d 224 (1989), the appellate court found that a provision waiving

any interest in the ex-husband's life insurance policies contained in a property settlement barred the ex-wife from collecting under the policy after the ex-husband's death. As in this case, the participant/ex-husband neglected to change his beneficiary designation after the ex-spouses signed the mutual waiver, which was drafted by the ex-wife's attorney. 136 Ill.Dec. at 702, 545 N.E.2d at 226.

provide the needed uniformity. We also disagree with Laurine's assertion that our decision imposes burdensome obligations on plan administrators. No such additional burdens will be imposed because, under the ERISA statutory scheme, a plan administrator must investigate the marital history of a participant and determine whether any domestic relations orders exist that could affect the distribution of benefits. This case arose from just such an investigation. Our decision only requires plan administrators to continue their current practice of thoroughly investigating the marital status of a participant.

■ Finally, Laurine asserts that James was unrepresented at their divorce hearing and that he did not read or understand the provisions of the property settlement, including the waiver provision. This argument is also unpersuasive. James did sign the agreement, and the waiver provision was simple and straightforward. Laurine's own lawyer inserted the waiver language, and Laurine makes no claim that she did not read or understand the settlement. She does not claim that she was unaware of what effect the waiver could have on her own claims. Laurine makes this claim even though both Laurine and James on the face of the agreement each stated under oath that they understood the contents of the property settlement.

It was suggested at oral argument that under our holding the Fund would be burdened with always having to investigate to determine if possibly there was a waiver, or something else affecting payment of the benefit to the last-named beneficiary. We place no such investigative burden or responsibility on the Fund beyond what is imposed by statute. Under the facts of this case we need only hold that the settlement waiver is effective when it becomes known to the Fund before payment. The Fund in its brief concurs in the holding we reach. We go no further.

### III.  CONCLUSION

The district court was correct in recognizing that a nonparticipant in an ERISA pension plan could waive rights to pension benefits. Laurine waived her right to any portion of the Death Benefit. The district court's entry of summary judgment against Laurine and in favor of Dessie is AFFIRMED.

EASTERBROOK, Circuit Judge, with whom BAUER, Chief Judge, and MANION, Circuit Judge, join, dissenting.

Three reasons might support giving James Brown's death benefits to his mother Dessie: the order of the state court, the contract between James and his former wife Laurine, and Laurine's waiver.

The first of these is unsatisfactory because the state court's order is not a "qualified domestic relations order", 29 U.S.C. § 1056(d)(3). Matrimonial law does not require one or another disposition of property in an uncontested divorce. James and Laurine were free to *agree* to anything they wanted. There is no state policy about the allocation of death benefits that could be disrupted. The state court's approval of the private settlement is like a consent decree, which should be treated like a contract. See *Firefighters v. Cleveland,* 478 U.S. 501, 517–23, 106 S.Ct. 3063, 3072–76, 92 L.Ed.2d 405 (1986). Consent decrees do not alter the legal obligations of strangers (here, of the Fund to enforce its written-designation rule). *Martin v. Wilks,* —— U.S. ——, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989).

The second (contract) is unsatisfactory because it attributes to James's act an effect other than the one specified by the Fund's governing documents—which 29 U.S.C. § 1104(a)(1)(D) requires it to follow. I agree with Judge Ripple's discussion of this statute and join his opinion. See also *Central States Pension Fund v. Gerber Truck Service, Inc.,* 870 F.2d 1148 (7th Cir.1989) (en banc); *Dardaganis v. Grace Capital, Inc.,* 889 F.2d 1237, 1240–42 (2d Cir.1989).

The third (waiver) is strongest because it bypasses reference to James's acts. The designated beneficiary may give away the money the instant she receives it. Waiver

is an anticipatory gift, to whoever is next in line under the Fund's rules (Dessie). Because an actual gift would be honored, it follows that an anticipatory gift should be given effect. This approach, however, runs into three difficulties. The first is that it, too, requires the Fund to disregard its written-designation rule. Second, under state law (more precisely, federal common law absorbing state law) unilateral promises to make gifts are not enforceable. There are exceptions to the non-enforcement of donative promises, but none is applicable to this case. (Dessie is not a charity!) The majority's opinion treats the waiver as if it had been signed after James's death, when Laurine would have had a present right to give the benefits to Dessie. It wasn't, she didn't, and the law distinguishes accordingly.

Even if the Plan did not contain a written-designation clause and an anticipatory gift were valid under principles of contract law, however, it would not be valid given the spendthrift clause in ERISA, 29 U.S.C. § 1056(d)(1), which says that "benefits provided under the plan may not be assigned or alienated". Although the majority holds that this rule applies only to "participants" in a pension plan as 29 U.S.C. § 1002(7) defines that term, it is not so limited. Section 1056(d)(1) bars the assignment of "benefits"—that is, payments under the plan—without regard to the identity of the person making that assignment. Section 1056(d)(2) reinforces this in saying that "a loan made to a participant or beneficiary shall not be treated as an assignment or alienation", an exemption unnecessary if the anti-alienation clause does not apply to beneficiaries in the first place. So Laurine could not have transferred the money to Dessie in exchange for a sofa—at least, Dessie could not have enforced the promise by attaching the benefits as they came in. Why, then, should Laurine be allowed to transfer the money to Dessie without getting a sofa?

A rule that prevents the beneficiary from giving up her claim is unappealing, but anti-alienation clauses are *designed* to frustrate individuals' desires. Equitable considerations are accordingly poor grounds

on which to disregard them. *Guidry v. Sheet Metal Workers Pension Fund,* —— U.S. ——, 110 S.Ct. 680, 687–88, 107 L.Ed.2d 782 (1990). ERISA does not stand alone in thwarting private choice. Federal insurance and annuity laws often provide that benefits must be paid to the person whose name is on file. These not only undo actual bargains, denying beneficiaries the autonomy to choose what to do with their wealth, but also produce some weird results. Still, we enforce them. E.g., *Prudential Insurance Co. v. Parker,* 840 F.2d 6 (7th Cir.1988). Although ERISA does not say "pay only the person whose name is on file", it does say that every plan must act "in accordance with the documents and instruments governing" it, 29 U.S.C. § 1104(a)(1)(D), and this plan has a written-designation rule. Our approach therefore ought to track that of *Parker.*

Rules requiring payment to named beneficiaries yield simple administration, avoid double liability, and ensure that beneficiaries get what's coming quickly, without the folderol essential under less-certain rules. Domestic relations orders, even if "qualified", do not take effect until lodged with a plan, something 29 U.S.C. § 1056(d)(3)(G)(i), (ii)(II) implies in establishing procedures for plans to evaluate orders once they have been lodged; honoring "qualified" orders on file reinforces rather than undermines the inference that pension plans may not look beyond written instructions. Written-designation rules accompany statutes that contain anti-alienation clauses, as ERISA and military insurance laws do. Perhaps this is so to ensure that the designation is an informed choice. Before accepting a change of beneficiary, the plan can provide the employee with an unbiased recap of his options and afford opportunity to reflect. We see designation rules on many other occasions. Think of the Wills Acts, requiring formality to make bequests; as a practical matter death benefits in a pension plan are bequests.

ERISA is full of unyielding rules, designed to simplify administration. Rules have their flaws; loopholes and overbreadth, both producing unpalatable out-

comes in the event of unanticipated circumstances, are among them. But whether to have rules (flaws and all) or more flexible standards (with high costs of administration and erratic application) is a decision already made by legislation. Congress and pension plans elected to use rules rather than standards; patterns of avoidance mean that we transmute the approach Congress chose into the one it rejected.

RIPPLE, Circuit Judge, with whom BAUER, Chief Judge, EASTERBROOK and MANION, Circuit Judges, join, dissenting.

This case presents an important issue in the administration of ERISA. In resolving that issue, we have one task: to ascertain and implement the will of Congress. Today's decision loses sight of that objective. Consequently, unless altered by the Supreme Court or Congress, the majority's approach stands as a significant impediment to achieving the congressional goal of efficient and certain administration of employee benefit plans.

### A.

As the majority quite pointedly notes, ERISA is a *federal* statute that sets *federal* standards for pension plans subject to its terms. Part of that *federal* mandate is contained in section 1104(a)(1)(D).[1] That section requires that a plan be administered in accordance with the documents and the instruments of that plan. This statutory command embodies a strong federal policy that all parties—participant, trustee, and beneficiary—be able to ascertain their rights and liabilities with certainty.[2] The plan at issue here fulfills that mandate quite explicitly. It provides that

the beneficiary of the plan is the person named by the participant "in the last written notice received in the Administrative Office prior to the Participant's death. It shall be the responsibility of the Participant to notify in writing the Administrative Office of his choice of Beneficiary or any change in Beneficiary." *See* R.1 at Ex. 1, § 6.4. There is no question that Laurine Brown is the person who, under the terms of the plan, ought to receive the death benefit.

In determining whether the property settlement agreement constitutes a binding waiver of these benefits on the part of Ms. Brown, this federal policy of administering the plan according to its documents must be respected in order to ensure that the purpose of ERISA is effectuated. However, the majority, by its over-reliance on state law principles, loses sight of that federal policy and, consequently, frustrates the congressional intent. Analogous principles of state law often can be helpful in interpreting a federal statute and in fashioning federal common law to close gaps in the legislative scheme. However, this methodology must be employed with extreme caution.[3] The ultimate objective is not to fulfill policy objectives of state law but to fulfill the congressional command embodied in the language and structure of the federal statute. Here, ERISA's command that a plan be administered in accordance with the plan's documents must be our primary concern in fashioning a waiver rule. The general maxims of state insurance law upon which the majority relies were not, of course, formulated with this explicit command of ERISA in mind. ERISA requires, in order to effectuate the federal policy of certainty in expectations and ease in administration, that beneficiary

---

**1.** Section 1104(a)(1)(D) of the Labor Title states that a plan administrator

    shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

    . . .

    (D) *in accordance with the documents and instruments governing the plan . . . .*
29 U.S.C. § 1104(a)(1)(D) (emphasis supplied).

**2.** We have already noted this congressional insistence on certainty of rights and obligations in our interpretation of § 515 of ERISA, 29 U.S.C.

§ 1145. *See Central States, S.E. & S.W. Areas Pension Fund v. Gerber Truck,* 870 F.2d 1148, 1153 (7th Cir.1989) (en banc).

**3.** As the majority sets forth in detail, Congress took great care in specifying the precise circumstances in which ERISA's anti-alienation provisions may be overridden by a state marital property settlement decree. Such care is ample evidence of the prudence and caution necessary in any reliance on "analogous" state law concepts.

changes be made according to the plan's documents. The documents require that the beneficiary change be made only by notification to the plan. Therefore, absent such notification by the participant, the waiver is not binding on the beneficiary.[4]

## B.

Even if we accept the proposition that, despite the lack of conformity with the statutory scheme of ERISA, a beneficiary can be considered to have waived an interest in the plan, there remains a difficult question with respect to the intent of Laurine Brown that has not been addressed satisfactorily by either the district court or the majority. The purported "waiver" is contained in a property settlement agreement executed by the parties as part of the dissolution of a marriage. That document was designed to adjust property rights between the parties "growing out of the marital or any other relationship now or previously existing between the parties." R.1 at Ex. 5. By its own terms, then, the agreement (or "waiver") does not deal with each party's choices with respect to the disposition of property after the divorce. Indeed, it is quite plausible to read the document as establishing nothing more than a waiver on the part of Ms. Brown of her right to insist on a QDRO[5] as part of the division of marital property. Indeed, such an interpretation is supported by the affidavit of Ms. Brown. R.16. She alleges that Mr. Brown made clear, both before and after the divorce, that he expected that the benefits would be payable to her. Consequently, despite the division of property

at the time of divorce, Ms. Brown had, she maintains, a legitimate expectation that she would receive the benefits. Both she and Mr. Brown were aware that the beneficiary designation had not been changed. At the very least, then, there is a triable issue of fact as to the intent of Ms. Brown with respect to the "waiver" that cannot be resolved on summary judgment.

The majority suggests that, if Mr. Brown wanted Ms. Brown to receive the benefits, he should have executed a new beneficiary form after the divorce. However, it must be remembered that Mr. Brown knew there already was a designation that conformed to the plan on file. He was entitled to conclude that, even if Laurine Brown had waived the benefits at the time of divorce, his decision not to change the beneficiary designation amounted to a redesignation. After all, he had been informed, at the time he made the original designation, that a change could be effected only by his coming to the office and changing the beneficiary.

Accordingly, I would reverse the judgment of the district court on the ground that the "waiver" was not effective because a change in the designation of beneficiary was never made by the participant. However, even under the approach of the majority, there remains a triable issue of fact that precludes summary judgment.

---

**4.** The primary federal legislative policy also renders irrelevant the fact that Ms. Brown's purported waiver is contained in a settlement agreement executed as part of a state divorce action. Even if we were to assume *arguendo* that the terms of the settlement are a manifestation of state policy because they are contained in a state judgment, we are still constrained to prefer the clear federal congressional mandate.

Similarly, if we were to construe Ms. Brown's waiver as an anticipatory gift to the contingent beneficiary, Dessie Brown, the fact remains that any such anticipatory gift would be valid, if at all, only under state law and such a state rule would contravene the federal policies embodied in ERISA. It would not only frustrate the federal mandate of section 1104(a)(1)(D) but also run afoul of ERISA's anti-alienation provision. 29

U.S.C. § 1056(d)(1). Indeed, the regulations, accompanying the corresponding tax provision, 26 U.S.C. § 401(a)(13)(A), define "assignment" and "alienation" as "[a]ny direct or indirect arrangement (whether revocable or irrevocable) whereby a party acquires from a participant *or beneficiary* a right or interest enforceable against the plan...." 26 C.F.R. § 1.401(a)–13(c)(1)(ii) (emphasis supplied).

**5.** ERISA permits a participant to alienate rights in a plan pursuant to a state court ordered domestic relations order that fulfills specific criteria set forth in ERISA. Such a state domestic relations order is called a "qualified domestic relations order" (QDRO). *See* 29 U.S.C. § 1056(d)(3).